CKR LAW, LLP
JONATHAN P. HERSEY, Cal. Bar No. 189240
   jhersey@slaterhersey.com
100 Spectrum center Drive, Suite 420
Irvine, California 92618
Telephone:  949-398-7500
Facsimile:  949-398-7501

Attorneys for Plaintiff
SHUANG YING (NANCY) ZHANG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHUANG YING (NANCY) ZHANG,<br><br>            Plaintiff,<br><br>    v.<br><br>A-Z REALTY & INVESTMENT CORP., a California corporation; DONGYAN (ANNIE) ZHENG, an individual; JENNIFER WHELAN, an individual; REALTY ONE GROUP, INC., a California corporation; JIHUI (LUCKY) LUO, an individual, SHI DAN CHEN, and individual; MING-WING LAM, an individual; FU LONG ZHENG, an individual; and DOES 1-30, inclusive,<br><br>            Defendants. | Case No. 5:19-CV-00887-VAP-KK<br><br>*Hon. Virginia A. Phillips*<br>*Courtroom 8A*<br><br>Complaint filed:   May 10, 2019<br><br>**PLAINTIFF'S JOINT OPPOSITION TO MOTIONS TO DISMISS**<br><br>HEARING<br>Date:        August 26, 2019<br>Time:        2:00 p.m.<br>Courtroom:  8A, 8th Floor |

## JOINT OPPOSITION TO MOTIONS TO DISMISS

Defendants Realty One Group, Inc. and its agent Jihui (Lucky) Luo (the "ROG/Luo Defendants") have filed a Motion to Dismiss the Complaint's first, third, fourth, sixth, seventh, ninth, tenth and eleventh claims for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants A-Z Realty & Investment Corp. and its owners and officers Dongyan (Annie) Zheng and Jennifer Whelan (the "A-Z Realty Defendants") have filed a Motion to Dismiss the first claim for relief pursuant to Rule 12(b)(6), with a request that the pendent state law claims for relief be dismissed for lack of subject matter jurisdiction. Because the ROG/Luo and A-Z Realty Defendants raise similar and overlapping issues, plaintiff Shuang Ying (Nancy) Zhang ("Plaintiff") submits this Joint Opposition to both motions.

## I.    INTRODUCTION

This is no ordinary business or real estate dispute out of which Plaintiff is attempting to concoct a federal RICO claim simply for the purpose of obtaining federal jurisdiction.

Plaintiff is the victim of a sophisticated criminal enterprise that defrauded her into leasing her home to them for the purpose of converting the property into a large-scale illegal marijuana growing operation. That criminal activity lasted longer than a year and yielded—by the defendants' own records—at least 6 different crops of 18,750 plants with an estimated value in excess of $2 million. The fraud began with the ROG/Luo Defendants, who worked with the phony tenants and the A-Z Realty Defendants to create at least two different fake rental applications, three different forged bank account statements, and two false credit reports. Plaintiff, an elderly and native Chinese-speaker, was told her home was being rented to "Mr. Wu and Ms. Li," a married couple with two young children who were moving to the neighborhood to run their new family restaurant. In reality, the ROG/Luo and A-Z Realty Defendants gave the keys to other defendants—likely Shi Dan Chen, Ming Wing Lam, and Fu Long Zheng—to do the growing and collect the crops for

1  distribution.  These "Occupant Defendants," some of whom are alleged to be family
2  relatives of the A-Z Realty Defendants, stayed in the property from February 2017
3  until March 2018.  They boarded all the windows and constructed growing rooms
4  complete with indoor irrigation, ventilation and high-powered growing lights,
5  resulting in more than $275,000 of damage.

6      Fearful that Plaintiff would discover the operation and call the police, the
7  defendants approached her with the "researched" claim that the growing operation
8  was legal but that she could be compensated with increased rent.  They also tried to
9  steal the property away from her at a significantly reduced price that they also
10  wanted her to finance.  When those efforts failed, they threatened to kill her.

11     This is, at heart, a quintessential organized crime complaint, which is the very
12  purpose for which the federal RICO statute was enacted.  Plaintiff has alleged—with
13  specificity—numerous predicate acts of racketeering by *each* of the defendants.  The
14  complaint properly pleads the existence of an association-in-fact enterprise between
15  the ROG/Luo Defendants, the A-Z Realty Defendants, and the Occupant
16  Defendants.  Their acts were related toward the common purpose of furthering an
17  illegal marijuana cultivation and distribution operation, of which Plaintiff was a
18  target victim for more than a year, but which was and remains a continuing threat.

19     The defendants' motions are little more than scatter-shot and cursory jabs that
20  the complaint supposedly fails to plead requisite facts.  But the motions utter neglect
21  to credit the trove of specific allegations detailing the basis for each claim.  And in
22  some instances, the defendants are just plain wrong on the law.  At a minimum,
23  neither motion raises an argument supporting the dismissal of any claim as a matter
24  of law that should be granted at without an opportunity to amend.  These are
25  precisely the types of motions the Court cautioned the defendants they should not
26  file.  *See* Standing Order, May 16, 2019, at 3:16-18 [Doc. #10].

27  **II.   LEGAL STANDARD**

28     In evaluating the sufficiency of a complaint under Rule 12(b)(6), courts

should be mindful that the Federal Rules of Civil Procedure generally require only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2); *see also Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In evaluating a Rule 12(b)(6) motion, courts engage in a two-step analysis. First, they must accept as true all non-conclusory, factual allegations. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Likewise, all reasonable inferences must be drawn in the plaintiff's favor. *See Doe v. U.S.*, 419 F.3d 1058, 1062 (9th Cir. 2005). Second, having accepted as true all non-conclusory allegations and drawing all reasonable inferences in plaintiff's favor, courts consider whether the complaint states a "plausible claim" for relief. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

The only heightened pleading requirement is for claims sounding in fraud, for which Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In general, the plaintiff's allegations of fraud must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106-1107 (9th Cir. 2003). In short, plaintiffs are required to specify the "time, place, and content" of the allegedly fraudulent conduct or statements. *Id*.

In some situations, courts may consider documents or evidence presented by a defendant outside the pleadings without converting the motion into one for summary judgment. *See Lee v. City of L.A.,* 250 F.3d 668, 688-89 (9th Cir. 2001). For example, courts may consider: (a) documents that are properly submitted as part of the complaint; (b) documents upon which the plaintiff's complaint necessarily relies and whose authenticity is not contested; and (c) matters of public record of which

1   the court may take judicial notice.  *See id.*

2        In light of these established pleading standards, the Defendants' motions are

3   at best a waste of time and resources, if not outright frivolous.  Indeed, in its May

4   16, 2019 Standing Order [Doc. #10], at 3:16-18, the Court cautioned the Defendants

5   that "Rule 12(b)(6) motions are discouraged unless counsel has a good faith belief

6   that such motion will likely result in dismissal, *without leave to amend*, of all or at

7   least some of the claims under applicable law" (emphasis added).  The Court also

8   warned that, "Unless clearly justified under the circumstances of the case, 'motions

9   to dismiss or in the alternative for summary adjudication' are discouraged.  These

10  composite motions tend to blur the legitimate distinction[s] between the two

11  motions, which have different purposes.  Frequently, the composite motions

12  introduce evidence that is extrinsic to the pleadings.  On the one hand, such

13  evidence is improper for consideration in a Fed. R. Civ. P. 12(b)(6) motion, while

14  on the other hand, treatment of the motion as a Rule 56 motion frequently results in

15  reasonable invocation of Rule 56(f) by the nonmoving party."  *Id.* at 3:7-14.

16       Unfortunately, the Defendants have ignored these orders.  Neither motion

17  should result in dismissal of any claims, much less without leave to amend.  In

18  addition, the A-Z Defendants submitted an extraneous and self-serving declaration

19  from Dongyan (Annie) Zheng offering a different (albeit untrue) version of the

20  facts.  *See* Decl. of Dongyan (Annie) Zheng [Doc. #19-1].  The declaration cannot

21  be considered on a motion to dismiss, nor have the A-Z Realty Defendants justified

22  why their motion should be converted to a motion for summary adjudication.  It

23  should not.  The declaration actually proves that the complaint contains sufficient

24  and specific enough facts to inform the Defendants of the full nature and scope of

25  Plaintiff's claims.  Those claims and the Defendants' counter-stories should be

26  subject to discovery and resolved on their merits.

27  **III.   SUMMARY OF RELEVANT FACTS**

28       Plaintiff's complaint contains 132 paragraphs of factual allegations

-4-

identifying each of the various parties and the basis for liability against them.  The allegations describe the nature and purpose of the criminal enterprise, each defendant's role and racketeering activities in furtherance of the scheme, and the injuries and property damages directly and proximately caused by their acts.

The Defendants' motions fail to address the vast majority of the complaint's alleged facts.  The ROG/Luo Defendants' 9-page memorandum contains a "summary of allegations" that is less than a page long and mentioning only 7 paragraphs of the complaint.  *See* ROG/Luo Defs.' Motion [Doc. #12], at 1:17-2:12.  The A-Z Realty Defendants' 10-page memorandum includes three-and-a-half pages of "pertinent facts," *see* A-Z Realty Defs.' Motion [Doc. #19], at 1:17-4:23, but hardly any are taken from the complaint.  The A-Z Defendants' Motion only includes *two* references to the complaint at all.  *Id.* at 1:19 & 2:20.  Instead, it bases its argument on an admittedly "disputed" alternate set of facts derived from Dongyan (Annie) Zheng's improper declaration.  *E.g. id.* at 2:1 ("Defendants dispute such assessment, and asset that all of Plaintiff's Property decisions were discussed with her son and husband."), 2:13 (stating that the Defendants' description of the facts are "[a]ccording to A-Z…."); & 2:13 20 (stating that Plaintiff's facts are "disputed by A-Z").

## A.    Background and Undisputed Facts

Plaintiff is a 75-year old Chinese immigrant who speaks and reads limited English.  She resides in El Monte, California, but is the owner of the rental home located at 16 Via Palmieki Court in Lake Elsinore, California (the "Property").  Cmplt. ¶¶ 8 & 20-21.  She signed a Property Management Agreement ("PMA") with the A-Z Defendants on July 11, 2016.  *Id.* ¶ 22.

In February 2017, the A-Z Defendants supposedly received a tenancy application from the ROG Defendants on behalf of a married couple, "Miaoyun Wu and Xin Li."  Cmplt. ¶¶ 23-24.  The ROG Defendants allegedly provided the rental application and certain background documents to the A-Z Defendants, who

-5-

informed Plaintiff about the rental opportunity.  *Id.* ¶¶ 25-28.

**B.**     **The Defendants Allegedly Knew and Participated in the Creation and Transmission of the Fake Rental Applications and Forged Bank Statements and Credit Checks**

The rental application and supporting background documents were fraudulent and contained false information.  They were purportedly prepared and submitted by the ROG/Luo Defendants on behalf of Miaoyun Wu and Xin Li.  They were printed on the ROG/Luo Defendants' forms but contained entries that were written over previously-erased or "whited-out" information related to a completely different property.  ***In other words, the ROG/Luo Defendants sloppily used their own forms to prepare the fake applications***.  Cmplt. ¶¶ 50-51.  In addition to the fake forms, many of the prior addresses do not exist.  The names, email addresses and phone numbers of prior landlords and employers are incomplete or invalid. "Mr. Wu's" and "Ms. Li's" driver licenses and social security cards are fake, and the bank statements they supposedly submitted contain forged numbers with different fonts and altered information.  *Id.*  The complaint alleges that the A-Z Defendants were knowingly complicit in helping prepare and accept the fake forms and then withholding them from Plaintiff until after the Occupant Defendants—not Mr. Wu and Ms. Li, whose identities were stolen and used by all of the Defendants—moved into the Property. *Id.* ¶ 51.

Dongyan (Annie) Zheng told Plaintiff she checked Mr. Wu and Ms. Li's background.  She said they had good credit scores, more than $60,000 in the bank, and owned a restaurant.  Zheng said they would make good tenants.  The A-Z Realty Defendants did not show the rental application, financial background documents or credit reports provided by the ROG Defendants or supposedly independently obtained by themselves to Plaintiff.  Cmplt. ¶ 25.  A-Z Realty rented the Property to tenants she thought were "Mr. Wu and Ms. Li," but whom the ROG/Luo and A-Z Realty Defendants knew were not.  *Id.* ¶¶ 25 & 49-51.

The Residential Lease or Month-to-Month Rental Agreement (the "Lease") is dated February 16, 2017, with an effective term of February 21, 2017 through February 28, 2018.  Jennifer Whelan's name is on the Lease on behalf of A-Z Realty.  The tenants completed and "signed" a Move-In Inspection form on February 16, 2017, and provided a receipt for the keys on February 18, 2017.  The A-Z Defendants did not show a copy of the Lease to Plaintiff until February 20, 2017.  One of the documents the A-Z Defendants had Plaintiff sign on February 20, 2017 was a second PMA that extended the term of the exclusive agreement through February 28, 2018.  The new PMA also increased A-Z Realty's monthly fee.  Cmplt. ¶¶ 25-28.

**C.    The Defendants Continue Their Fraudulent Misrepresentations, Including Mail and Wire Fraud, to Cover Their Tracks**

In May 2017, Zheng called Plaintiff and told her that she had "heard" that Chinese syndicates from the Fujian Province were renting big houses in residential neighborhoods to grow marijuana.  Zheng said that these syndicates of growers were willing to pay $2.50/sf, almost twice the amount that Mr. Wu and Ms. Li were paying at $1.54/sf.  Zheng also said that "Mr. Wu and Ms. Li" were from the Fujian Province and could be growing marijuana in the Property.  Cmplt. ¶ 29.

Zheng supposedly went to inspect the Property on May 11, 2017.  That evening., she sent Plaintiff an email with photos of her inspection.  Several photos showed newly constructed and unfinished walls, window coverings and exposed electrical wiring and irrigation that had been added to the interior of the home.  Other photos showed approximately 150 marijuana plants in large tubs in the constructed growing rooms inside the Property.  Two photos showed letters that Zheng supposedly found in the Property from a Dr. William S. Eidelman, M.D., stating that Chen and Lam were under Dr. Eidelman's care and were approved for the use of medical marijuana.  Cmplt. ¶ 30.

Zheng followed up the email with a phone call to Plaintiff.  Plaintiff said that

marijuana growing was illegal and that her husband would report the matter to the police the following day.  Zheng responded that the doctor's letters proved that the occupants could legally grow the marijuana and suggested that Plaintiff demand higher rent from the Occupant Defendants rather than reporting them to the police and having them evicted.  Cmplt. ¶¶ 31-33.  The next morning, Zheng sent Plaintiff another email stating that it is legal for the occupants to grow marijuana in the Property.  Zheng attached four screenshots of articles purporting to describe the legality of residential marijuana growing in California.  Zheng's statements on the phone and her emails were misleading, and likely an attempt to persuade her not to call the police.  The website from which Zheng took the screenshots is run by an individual named Robert Bergman, an Amsterdam private citizen who uses his website to promote a marijuana seeds business.  *Id.* ¶¶ 32-34.  The beginning of the article, which Zheng omitted from her screen shots, states that, "California can now legally grow up to six marijuana plants at home," and that persons in California can "[p]ossess no more than 6 plants."  The pictures Zheng had sent Plaintiff the prior evening had 25 times that number of plants, but Zheng omitted portions of the article (that was printed in English) causing Plaintiff to believe that "Mr. Wu and Ms. Li" or whoever the real occupants are were legally allowed to have a marijuana farm in the Property.  *Id.*  ¶¶ 34-35.

A few days later, Zheng came back to Plaintiff and told her that she negotiated with the "occupants" for increased rent from $2,500 to $5,000, and a $20,000 "penalty" to be paid in two $10,000 installments in June and October 2017. Zheng demanded that Plaintiff pay A-Z Realty a nearly-doubled monthly management fee.  Cmplt. ¶ 36.

In October 2017, Plaintiff went to A-Z Realty's office to get the October rent and second $10,000 payment.  Zheng said she did not have the $10,000 but would "ask the tenants."  Zheng told Plaintiff to sell the Property to the occupants, which according to Zheng would be better for both her and Plaintiff.  Cmplt. ¶ 37.  Zheng

1  proposed that Plaintiff take 30% as the down payment and agree to finance the

2  remaining 70% of the purchase price Plaintiff that the "occupants" refused to pay

3  the remaining $10,000 unless Plaintiff would agree to extend the lease for another

4  year.  Plaintiff refused.  *Id.* ¶¶ 37-39.

5      Without Plaintiff's knowledge or approval, Zheng offered to sell the Property

6  to the "tenants."  She sent a text message to a person she referred to as the "tenants'

7  contact person" saying that Plaintiff would agree to sell the Property for a 30%

8  down payment and a 70% seller carry-back that the buyers could pay-off with

9  monthly installments.  Cmplt. ¶ 39.

10      **D.    Plaintiff is Subjected to Multiple Death Threats**

11      Zheng then showed the "tenant's contact person's" response to Plaintiff.  The

12  response threatened Plaintiff's life and warned that she should "not fight with the

13  chief of gangsters."  It also evidences Zheng's ties to the Occupant Defendants and

14  their "contact person," which is likely a relative or close acquaintance.   In the

15  message, the "contact person" refers to Zheng as "Jie," which is the Chinese word

16  for an older sister related by blood or a woman with whom the person has an

17  extremely close relationship.  While the message instructed Zheng to tell Plaintiff

18  not to "fight with the chief of gangsters," the contact person also told Zheng that, "I

19  won't betray you.  I won't betray Mr. Wu."  Under these threats and at Zheng's

20  urging, Plaintiff felt forced to agree to extend the Lease for another year as

21  demanded.  Zheng supposedly relayed the message to the "chief of the gangsters,"

22  and then informed Plaintiff that they had paid the second $10,000 installment.  *Id.* ¶¶

23  40-42.

24      In January 2018, Plaintiff's husband read an article titled "US Attorney

25  General Jefferson Sessions Orders Crackdown on Marijuana Crimes" printed in the

26  China Daily newspaper.  Plaintiff forwarded a copy to Zheng and said that,

27  according to the article and contrary to Zheng's representations, the occupants'

28  marijuana growing operations were illegal.  Cmplt. ¶ 44.  Plaintiff demanded that

they move out by the end of February as per the original Lease and that the Property be restored to its original state. On February 7, 2018, Zheng issued a letter to "Mr. Wu and Ms. Li" saying that Plaintiff would not agree to extend the Lease. On February 16, 2018, Zheng sent an email to Plaintiff attaching several text messages from contact/ manager. *Id.* ¶45. The email stated that the occupants wanted to remain in the Property at least until the end of April 2018 when the plants would be fully grown and could be harvested. They added several more death threats against Plaintiff. Again, the contact's/manager's messages referred to Zheng as "Jie," and also said, "You are Zhu Mou," meaning a person who is a strategist, planner, instigator, mastermind, or leader of a plot. Cmplt. ¶¶ 46-48.

In broad-brush, the ROG/Luo Defendants represented the Occupant Defendants and provided false and fraudulent rental applications, identifications and financial information to assist the Occupant Defendants to gain access to the Property. The A-Z Defendants provided the false and fraudulent rental applications, identifications and financial information to Plaintiff to trick her into leasing the Property to "Mr. Wu and Ms. Li," who in actuality were the Occupant Defendants. The Occupant Defendants converted the Property into a large-scale marijuana growing operation, cultivating at least 6 different crops, severely damaging the Property in the process. They, along with the A-Z Realty Defendants, misled and threatened Plaintiff's life to deter her from reporting the operation to the police or taking steps to evict them.

## IV.   ARGUMENT

The A-Z Defendants' motion challenges *only* the complaint's first claim for relief for alleged violations of RICO Sections 1962(c) and 1962(d).[1]  *See* A-Z Realty

---

[1]  The A-Z Realty Defendants also argue that Plaintiff's complaint fails to allege facts showing how much money (if any) they made, used and invested in the continuing criminal enterprise activities as required by the RICO Act Sections 1629(a) and 1629(b). *See* A-Z Realty Defs.' Motion [Doc. #19], at 5:12-17; 8:4-5;

1   Defs.' Motion [Doc. #19], at 5:10-9-28.  They do not contest any of the state law

2   claims, except to argue that if the federal RICO claim is dismissed that the Court

3   should refuse to exercise jurisdiction over the pendent claims.  *Id.* at 4:25-5:8.

4         Like the A-Z Realty Defendants, the ROG/Luo Defendants challenge the

5   sufficiency of the RICO pleadings.  *See* ROG/Luo Defs. Motion [Doc. #12,], at 3:6-

6   7:26.  However, they also add two arguments with regard to the various state law

7   claims; namely that (1) they cannot be held liable for the marijuana growing

8   Occupant Defendants' actions because they were merely those Defendants' agents

9   (*id.* at 8:9-15), and (2) the alleged fraud and negligent misrepresentation claims are

10  not pled with sufficient specificity.  *Id.* at 8:16-9:8.

11        For each of the reasons stated below, none of the arguments is supported by

12  the alleged facts or the law.

13        **A.    The Complaint Sufficiently Alleges a § 1962(c) RICO Claim**

14        To state a claim under RICO Section 1962(c), a plaintiff must allege "(1)

15  conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."

16  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Walter v. Drayson*, 538

17  F.3d 1244, 1247 (9th Cir. 2008).  "RICO is to be read broadly" and "liberally

18  construed to effectuate its remedial purposes."  *Sedima*, 473 U.S. at 497-98; *Odom*

19  *v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (citation omitted).  As such, to

20  properly plead the claim, a plaintiff merely needs to allege sufficient facts showing

21  that the defendants were "associated with" an enterprise engaged in activities that

22  affect interstate or foreign commerce, directly or indirectly, in the conduct of the

23  enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(c).

24

25

26  & 8:19-9:5.  These arguments are irrelevant because Plaintiff does not allege
    violations of Sections 1629(a) or (b), just (c) and (d).  In any event, the complaint

27  alleges that that the A-Z Realty Defendants invested in and received money from
    the enterprise in at least two ways: (1) through the increased management fees

28  they demanded (Cmplt. ¶ 36), and (2) from a share of the crop profits (*id.* ¶ 109).

In this regard, the ROG/Luo Defendants and A-Z Realty Defendants appear to make three arguments: (1) that the Complaints fails to plead an "enterprise," (2) that the complaint fails to plead a "pattern" of "predicate acts of racketeering activities; and that the complaint lacks facts showing the effect on interstate or foreign commerce.  None of the arguments holds merit.

### 1. The Complaint Sufficiently Pleads the Existence of an Associated-In-Fact Enterprise

RICO defines "enterprise" in a fairly pedestrian manner: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  This is not a stringent standard to plead.  An associated-in-fact enterprise must merely have the following three features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.  *E.g., Boyle v. United States*, 556 U.S. 938, 946 (2009).  As the Supreme Court succinctly stated, an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette,* 452 U.S. 576, 583 (1981).

The separate defendants are not alleged to be the enterprise itself.  Plaintiff's complaint alleges that the ROG Defendants, the A-Z Defendants and the Occupant Defendants are each members of an amalgamated association-in-fact enterprise.  The common purpose of the enterprise is the cultivation, harvesting and distribution of the marijuana crops.  *See* Cmplt. ¶ 74.

The structure of the enterprise includes persons responsible for the cultivation and sale of marijuana (the Occupant Defendants) and persons who assist them with the location and leasing of the properties in which to farm their products and conduct their related illegal activities (the ROG Defendants and A-Z Defendants).

The A-Z Realty Defendants argue that the RICO claim should be dismissed because it fails to plead that they had any role in directing the enterprise's affairs.  In

-12-

the RICO context, "directing" has a different meaning than is commonly understood.  While a plaintiff must plead that the defendant conducted or participated in the conduct of the enterprise's affairs as opposed to the defendant's own affairs, the plaintiff is not required to plead or prove that a defendant was in charge of or had "significant control over or within [the] enterprise."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 fn.4 & 185 (1993) (citations omitted).  Direction need not come down through a "hierarchical structure or a 'chain of command . . . .'"  *Boyle v. United States,* 556 U.S. 938, 948 (1981).  Moreover, "[m]embers of the group need not have fixed roles; different members may perform different roles at different times."  *Id.*  Similarly, "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies."  *Id.*  "While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by quiescence."  *Id.*

Regardless, the Complaint pleads sufficient facts regarding the structure of the enterprise and relationship between the members.  The Occupant Defendants have a "contact" or "manager" ("Mr. Wu") who gives the appearance of negotiating with a property manager.  The enterprise is also alleged to have a "mastermind" or "instigator," possibly Zheng ("Zhu Mou"), Chen, or F.L. Zheng.

Finally, the Complaint pleads the longevity of the enterprise, which is alleged to have lasted at least 14 months ***with regard to Plaintiff's Property alone***.  The overall enterprise and scheme are alleged to have begun with other properties taken over by gangsters from the Fujian region, and which are likely continuing with other properties since the Occupant Defendants removed their crops and moved on to different properties to start the process over.  *E.g.,* Cmplt. ¶ 78.  This is reinforced by the factual allegations supporting a familial relationship at least between the Occupant and A-Z Realty Defendants.  *Id.*

-13-

### 2. The Complaint Sufficiently Alleges a Pattern of Racketeering Activities By Each Defendant

RICO makes it unlawful for any person employed by or associated with an enterprise to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1961(c). Defendants challenge the complaint as failing to plead such a pattern.

To begin, the Complaint clearly pleads multiple "racketeering activities." Although Congress passed RICO in part to combat mobsters, RICO is "not limited in application to organized crime." *H.J. Inc. v. NW. Bell Tel. Co.*, 492 U.S. 229, 248 (1989). The sweeping language of the statute has led courts to apply RICO in a wide range of contexts beyond traditional crime-fighting. Here, Plaintiff alleges that the Defendants violated the federal Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, and related California state and local law by "growing, processing, distributing, and selling cannabis and cannabis products." By definition, growing or dealing in cannabis constitutes racketeering under 18 U.S.C. § 1961(1) (defining "racketeering activity" to include "felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance"); *see also* 21 U.S.C. § 841 (criminalizing the manufacture, distribution, dispensing, or possession of controlled substances including marijuana).

Included in the alleged predicate acts are, among others, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343. To state a claim for mail and wire fraud, a Plaintiff must plead, in addition to the other elements of a RICO claim, "(1) a scheme or artifice devised with (2) specific intent to defraud and (3) use of the United States mail or interstate telephone wires in furtherance thereof." *Orr v. Bank of America*, 285 F.3d 764, 782 (9th Cir. 2002). The Complaint details all of the alleged emails, texts and phone calls of both fraudulent and threatening natures. *See*, *e.g.,* Cmplt. ¶¶ 20-25 & 41-48. Cmplt. ¶¶ 73 & 77. Although RICO itself is not subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standards,

predicate acts alleging fraud must be pleaded with particularity.  *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004).  At a minimum, this requires that the complaint must "state the time, place and specific content of the false representation as well as the identities of the parties to the misrepresentation." *Id.*

The A-Z Defendants argue that the Complaint fails to plead predicate acts by *each* defendant.  The ROG/Luo Defendants accuse Plaintiff of merely lumping the different Defendants into a single group and failing to differentiate the different acts of illegal drug cultivation or mail or wire fraud separately.  That is simply not true.  The Complaint takes great pains to identify precisely how, when, by whom and to whom each of the alleged acts of fraud were committed:

- The creation and transmission through interstate mail and by interstate wire of the fraudulent Mr. Wu and Ms. Li rental applications, fake identity documents and other forged financial information by Luo to Zheng and Whelan at or around February 16, 2017.

- The creation and transmission by the A-Z Defendants of the fraudulent Lease by Zheng and Whelan to Plaintiff on or around February 20, 2017.

- The transmission through interstate mail and by interstate wire of the misleading and fraudulent marijuana growing information by the Zheng to Plaintiff in May 2017.

- The transmission through interstate mail and by interstate wire of the Property sale proposals by Zheng to the Occupant Defendants or their unidentified manager/representative "Mr. Wu" in October and November 2017 (and specifically November 15, 2017), and then again in February 2018 (specifically February 7 & 16, 2018).

1              •  The death threats transmitted through interstate wire by the

2                  Occupant Defendants ("Mr. Wu") and Zheng to Plaintiff, on or

3                  about November 15, 2017 and February 16, 2018.

4          Each of the Defendants has conducted and participated in the conduct of the

5    affairs of the marijuana growing enterprise through a pattern of racketeering activity

6    by committing more than two related and continuous acts of racketeering, as defined

7    in 18 U.S.C. § 1961(1), through the ongoing cultivation, distribution and sale of

8    marijuana and cannabis products, a Schedule I controlled substance, in violation of

9    the Controlled Substances Act ("CSA") and other laws, statutes and ordinances

10   mentioned above.  The ROG Defendants and A-Z Defendants represented the

11   occupants and gangsters in leasing the Property and enabling the cultivation,

12   distribution and sale of the marijuana crops.  They used interstate mail and wire

13   mechanisms to further the conspiracy.  The Occupant Defendants are believed to

14   have cultivated the marijuana, and the occupants' "contact/manager" ("Mr. Wu")

15   assisted with and participated in the leasing and growing operation and also

16   threatened Plaintiff's life.

17         Moreover, the Complaint does not need to prove that Plaintiff was the

18   intended victim of each of the racketeering acts, just a victim of the enterprise's

19   scheme.  RICO authorizes "any person" injured in his business or property by

20   racketeering to bring a civil action, 18 U.S.C. § 1964(c), not just "targets" of

21   racketeers.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495-496 (1985).  A

22   RICO plaintiff "is not required to plead that she is a victim of defendant's

23   underlying crime."  *Ainsworth v. Owenby*, No. 6:17-cv-01935-MC, 2018 WL

24   3964807 *15 (D. Oregon August 17, 2018), *citing Bridge v. Phoenix Bond &*

25   *Indemnity Co.*, 553 U.S. 639, 649-650 (2008).

26         After alleging the requisite predicate acts, the Complaint sufficiently alleges

27   facts supporting the "pattern" of activities.  A "pattern of racketeering activity"

28   consists of at least two acts of racketeering, the last of which occurred within ten

-16-

1  years.  18 U.S.C. § 1961(5).  To establish a pattern, a complaint must allege, beyond

2  two acts of racketeering, (1) that the acts of racketeering are related and (2) that they

3  amount to or pose a threat of continued criminal activity.  *H.J. Inc. v. Northwestern*

4  *Bell Tel. Co.,* 492 U.S. 229, 239 (1989).

5        Predicate acts are related if they "have the same or similar purpose, results,

6  participants, victims, or methods of commission, or otherwise are interrelated by

7  distinguishing characteristics and are not isolated events."  *Id*. at 240 (quotation

8  omitted).  The acts of racketeering alleged in this action are not isolated or sporadic.

9  They are all related to the establishment and operation of a business to grow,

10  process and sell cannabis in violation of federal law.

11        In RICO parlance, the pattern or continuity of the alleged criminal activity

12  can be shown either by "a closed period of repeated conduct, or past conduct that by

13  its nature projects into the future with a threat of repetition."  *H.J. Inc.*, *supra,* 492

14  U.S. at 241.  Closed-ended continuity refers to a series of related predicates

15  extending over a substantial period of time.  *Id*. at 242-243.  There is, however, no

16  bright-line test.  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1992).

17  Typically, closed-end continuity requires alleged racketeering acts performed over a

18  period of time of at least one year.  *E.g.*, *Turner v. Cook*, 362 F.3d 1219, 1231 (9th

19  Cir. 2004).

20        Open-ended continuity refers to predicate acts that, by their nature, suggest a

21  risk of on-going criminal activity.  *HJ Inc.*, *supra*, at 242-243.  Importantly, the risk

22  of continued criminal activity must be assessed as of the time the activity was

23  occurring, not in light of subsequent events.

> Subsequent events are irrelevant to the continuity determination
> ..., because in the context of an open-ended period of
> racketeering activity, the threat of continuity must be viewed at
> the time the racketeering activity occurred.  The lack of a threat
> of continuity of racketeering activity cannot be asserted merely
> by showing a fortuitous interruption of that activity such as by
> an arrest, indictment or guilty verdict.

*Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 410 (6th Cir. 2012).  But the "fortuitous interruption of criminal acts does not preclude a finding of open-ended continuity."  *Allwaste, Inc. v. Hecht*, 65 F.3d at 1529 (citing *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)).

In *Ticor Title Insurance Co. v. Florida*, 937 F.2d 447, 450-451 (9th Cir. 1991), for example, a real estate company's three episodes of forging lien release documents over 13 months satisfied the continuity requirement, because the frequency of the forgeries suggested that the practice had become the company's "regular way of conducting business."  Likewise, in *Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990), plaintiff alleged a pattern of racketeering activity where the defendant filed fraudulent annual reports in 1982 and 1983, because there was no evidence that the defendant would have stopped filing such reports so long as the organization remained in business.

Here, the complaint alleges facts supporting both a closed-end *and* open-end continuity.  For the closed-end analysis, the conduct started in late 2016 with the signing of the PMA, and continued through at least March 2018 when the Occupant Defendants finally removed their crops and abandoned the destroyed Property.  With specific regard to Plaintiff's Property, the pattern of racketeering arises from and includes the separate cultivation of at least 6 different crops of marijuana plants inside the Property, the multiple threats made against Plaintiff's life, and the numerous uses of interstate mail and wire to transmit fraudulent and misleading statements and threats.

Plaintiff also alleges that the criminal conspiracy is continuing and was threatened to continue, as evidenced by, among other things, Zheng's statement that a number of persons from the Fujian Provence are looking to rent large houses in the area to create marijuana farms, and the occupants' repeated requests to extend the Lease, including for an additional year after it was set to expire.  On information and belief, there is also a longstanding and on-going and possibly familial relationship

-18-

between the defendants, including but not limited to Zhang, F.L. Zheng, and/or "Mr. Wu.".  The defendants' activities therefore amount to or pose a threat of continued criminal activity, including both a series of related acts extending over a substantial period of time of more than a year (from at least February 2017 until March 2018), as well as a specific threat of repetition with the continued sale of the marijuana and use of other properties in the same manner and for the same purposes.

For open-ended continuity, as has previously been discussed, the Complaint sufficiently alleges a longer history of similar conduct arising from gangsters from China's Fujian province, the threat of which was likely to continue with other unsuspecting landlords and property owners, regardless of whether Plaintiff's actions caused them to flee the immediate area.  Nor does it matter that Defendants' cannabis growing has now ceased. Open-ended continuity is determined based not on whether activity is literally ongoing at the present time, but on whether at the time of the activity there was a "threat of repetition." *H.J. Inc.*, 492 U.S. at 242; *see Allwaste, Inc.*, 65 F.3d at 1530 (finding open ended continuity where "the predicate acts could have recurred indefinitely" "if [the defendants] had not been fortuitously interrupted"). Here, the complaint suggests that Defendants' activity was their "regular way of doing business." *See H.J. Inc.*, 492 U.S. at 242.

### 3.  The Complaint Sufficiently Alleges an Effect on Interstate Commerce

The effect of the activities of the enterprise on interstate and/or foreign commerce includes the alleged transport, distribution and sale of large quantities of marijuana and other cannabis products across state lines and in the stream of interstate and international commerce, including but not limited to the use of interstate wires for communication and the interstate and international transfer of money, both for the illegal crop products and also for the property rentals.  *See*, *e.g.,* Cmplt., ¶ 75 (alleging "the rent and other payments for the Property, and the nearly 19,000 marijuana plants grown at the property, have been used and moved in, and thereby affected, interstate commerce").

## B.   The Complaint Sufficiently Alleges a § 1962(d) RICO Claim

ROG and Lucky Luo make no independent challenge to the conspiracy claim. Their only argument is that the conspiracy claim fails because the Section 1962(c) claim is not adequately pled.  This challenge therefore fails for the same reasons as those challenges to the Section 1629(c) claim.

A-Z argues that the complaint contains only conclusory allegations of a conspiracy but fails to allege an agreement to participate in the racketeering activities or involvement in at least two predicate acts.  The complaint alleges a violation of 18 U.S.C. § 1962(d).  The broad range of circumstances and predicate acts giving rise to the conspiracy are described in paragraphs 20-58 of the Complaint.  Plaintiff alleges that each of the defendants conspired with some or all of the other defendants, and possibly other unidentified individuals and entities, in violation of 18 U.S.C. § 1962(d), to commit the acts of racketeering.  Each of the Defendants knowingly agreed to facilitate the scheme that includes the operation and management of the marijuana farming criminal enterprise, including but not limited to obtaining false identity documentation and creating false rental applications, providing false tenant information and leases, obtaining medical growth and usage letters to give the impression of legitimacy and legality, and assisting in the growth, distribution and sale of the illegal marijuana products.  They also conspired to trick, convince or threaten Plaintiff and other property owners not to report the criminal activities to law enforcement agencies.

## C.   The Pendent State Law Claims Are Sufficiently Pled and With the Requisite Particularity When Required

The supplemental state law claims include: breach of fiduciary duty against the A-Z Defendants; intentional fraud and deceit against all defendants; negligent misrepresentation against all defendants; breach of the PMA contract against A-Z Realty; trespass and wrongful occupancy against all defendants; nuisance against all defendants; elder abuse against all defendants; financial elder abuse against all

1  defendants; intentional infliction of emotional distress against all defendants;

2  negligence/property damage against all defendants; and statutory unfair competition

3  in violation of California Business & Professions Code § 17200 against all

4  defendants.

5     The A-Z Realty Defendants do not raise any direct challenges to the state law

6  claims.  The ROG/Luo Defendants lump all of the state law claims together, and

7  only raise two arguments: (1) that ROG is an "agent" that is not vicariously liable

8  for the torts of its principals; and (2) that the state law claims fails to plead the

9  underlying fraud with the required specificity.

10            **1.  The "Agency" Argument Fails**

11     Initially, the Complaint does not allege that the ROG/Luo Defendants are

12  merely the agents of the gangsters.  Rather, the Complaint alleges that the ROG/Luo

13  Defendants directly participated in the fraudulent activities and racketeering

14  activities, in part, by creating the fake rental applications ***on their own real estate***

15  ***forms***.  The Complaint is not limited to a "respondeat superior" theory as

16  Defendants contend.

17     Regardless, the ROG/Luo Defendants are simply wrong on the law.

18  Respondeat superior liability applies to RICOI.  *Brady v. Dairy Fresh Products Co.,*

19  974 F.2d 1149, 1153-55 (9th Cir. 1992) (holding that the doctrine of respondeat

20  superior "can probably be best explained as an outgrowth of the sentiment that it

21  would be unjust to permit an employer to gain from the intelligent cooperation of

22  others without being responsible for the mistakes, the errors of judgment and the

23  frailties of those working under his direction and for his benefit.") (citing *Petro-*

24  *Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349,1358 (3d Cir.1987)).

25  "[T]he purposes of RICO are furthered by applying the doctrine of Respondeat

26  superior because Congress created a private right of action under RICO at least in

27  part to compensate victims of racketeering."  *Id.*; *see also Sedima, S.P.R.L.,* 473

28  U.S. at 497-98.

### 2.  The Third Claim for Intentional Fraud and Deceit and Fourth Claim for Negligent Misrepresentation Are Pled With Specificity

As described above, the Complaint sufficiently describes the "who, what, where, when and how" of the alleged intentional and negligently fraudulent behavior for each defendant.  The Complaint identifies the particular documents fraudulent created and transmitted by the ROG/Luo Defendants.  It also includes a description, with names, dates, and verbatim quotes, of the different emails and text messages sent by the various Defendants and upon which Plaintiff relied in renting the Property to "Mr. Wu and Ms. Li," and then believing that the marijuana growth activities were supposedly legal.

### D.    If Necessary, Plaintiff Should Be Granted Leave to Amend.

The standard for granting leave to amend is generous.  Federal Rule of Civil Procedure 15 provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).  Courts consider five factors: bad faith, undue delay, prejudice to the opposing party, previous amendments, and whether amendment would be futile.  *U.S. v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).  Because there is no evidence of bad faith, delay, prejudice or prior amendments here, leave should be granted unless amendment would be futile. *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*, 806 F.3d 1393,1401 (9th Cir. 1986).  In short, the Court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks and citation omitted).

If necessary here, amendment would certainly not be futile.  For the "rhetorical" questions posited by the A-Z Realty Defendants (e.g., why would Zheng call the police if she was a part of the conspiracy?), Plaintiff could allege that Zheng first did what she declares she did in hopes Plaintiff would want to

-22-

*voluntarily* acquiesce in the presence of the marijuana farm in exchange for higher rent.  When that did not work, Plaintiff deliberately left out the findings in her research that more than 6 plants in the Property was illegal and could subject Plaintiff to arrest and incarceration and her Property being forfeited.  Zheng is either lying about the fact that she reported the marijuana operation to the police at all, or purposely misled the police regarding the number of plants involved, or is not being truthful about the response she received from the police.  Why would she do this?  To support her false claims of legality of the enterprise to Plaintiff and with the hope it would provide her cover if and when she was caught.

Despite the facts that Defendants' alleged racketeering activities and enterprise were cloaked in fraud and false identities, Plaintiff's investigation also continues to uncover new facts supporting her claims.  For example:

- One of these victims of Defendants' identity thefts—Ms. Li—has filed a report with Rancho Cucamonga police, who passed the investigation to the Riverside County Sheriff's Department.  The Sheriff's Department is interviewing the Ms. Li, planning interviews with the Defendants, and attempting to locate the Occupant Defendants.

- Defendants Lucky Luo and Realty One Group have continued to represent alleged gangster and Occupant Defendant Shi Dan Chen as his realtor *after* Chen and the other alleged Occupant Defendants fled Plaintiff's Property.  Luo and Realty One Group are the sales agent for a house owned by Chen in Lake Elsinore that he put on the market *after* this lawsuit arose.  Chen is believed to be purchasing a new property in New Jersey or New York, likely attempting to flee this jurisdiction with his assets, and with the continued assistance of Luo and Realty One Group.  Luo and Realty One Group have refused to reveal Chen's current whereabouts or contact information, which Plaintiff will need to acquire through discovery.  It is simply not credible for a

1   real estate agent like Luo—who has a current sales contract with Chen to sell

2   his property—to not know his address and other contact information.

3   The Court should not decide the important issues raised by this case in the

4   initial round of pleading at a minimum without leave to amend if necessary.

5   **V.      CONCLUSION**

6   For each of the foregoing reasons, the Court should deny Defendants'

7   motions to dismiss.  Discovery should begin so that evidence may be presented on

8   the full nature and scope of Plaintiff's injuries, and the claims resolved on their

9   merits.

10

11   DATED: August 5, 2019                    CKR LAW, LLP

12                                   By:   */s/ Jonathan P. Hersey*

13                                          Jonathan P. Hersey
                                            Attorneys for Plaintiff
14                                          SHUANG YING (NANCY) ZHANG

15

16

17

18

19

20

21

22

23

24

25

26

27

28